544 So.2d 816 (1989)
William Curtis BUTLER
v.
STATE of Mississippi.
No. 58364.
Supreme Court of Mississippi.
May 3, 1989.
Travis Buckley, Ellisville, William E. Phillips, Laurel, for appellant.
Mike Moore, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
PRATHER, Justice, for the Court:
Recognizing that innovative alternatives to the traditional criminal sanction of imprisonment were needed, our legislature enacted the Restitution to Victims of Crime Act. Miss. Code Ann. § 99-37-1 et seq. Victim restitution in the criminal process is an issue in this appeal. William Curtis Butler, defendant below, was tried in the Circuit Court of Harrison County for the shooting death of Charles F. Lassabe. The jury found him guilty of manslaughter, and he was sentenced to twenty (20) years imprisonment in the Mississippi Department of Corrections; however, Butler's sentence was suspended and Butler was placed on probation for a period of five (5) years on certain conditions, including restitution to victims. From this conviction he now perfects his appeal to this Court and assigns as error the following:
(1) The trial court erred in refusing the appellant's jury instruction D-10.
(2) The trial court erred in refusing to grant appellant's jury instructions D-11 and D-12.
(3) The trial court erred in not granting the appellant's peremptory instruction.
(4) The trial court erred in overruling the motion for new trial or alternatively for JNOV.
*817 (5) The trial court erred in the imposition of sentence.

I.
The appellant in this case, William Butler (Bill), was an attorney living in Pass Christian, Mississippi at the time of this tragic event. For tax shelter purposes, he desired to purchase a shrimp boat. The deceased, Charles F. Lassabe (Chuck), was to be hired by Butler to captain the shrimp boat. The two men had been spending time together searching for a shrimp boat for the appellant to buy.
On August 27, 1985, Bill and Chuck spent part of the day looking for a suitable boat for Bill to purchase. After spending most of the day looking for a boat, Bill and Chuck went to Mary's Grocery, a bar, to drink beer and shoot pool. Butler's wife, Janie, drove to Mary's Grocery around 8:30 p.m. While she was having a conversation with Bill, Chuck asked Janie to bring his girl friend, Dawn Carter (nicknamed Dee Dee) from her father's house. Janie said that she was tired and did not feel like transporting Dee Dee, but Chuck apparently insisted and Janie claimed that he called her a "bitch." Chuck also allegedly told Bill "if you don't like me calling your wife a bitch, I'll stomp your brains through the ground right here."
Eventually Janie consented to bring Dee Dee from her father's house to meet the group at the Butler residence. Bill and Chuck remained at Mary's Grocery.
When Bill finished his last game of pool, Chuck was on the telephone. Bill approached him and stated, "come on Chuck, I'm going to take you home so you can scratch your old lady's behind." Chuck threw the telephone down and struck Bill in the mouth, cutting his lip in the process. No fight broke out at this time, and apparently Bill even purchased several rounds of beer for everyone. He and Chuck remained at the bar for approximately 30 more minutes and then drove to the Butler residence.
When the two men arrived at the Butler residence, they were apparently on good terms and in fact were laughing and joking. When asked about his lip, Bill related that Chuck had hit him. Chuck then said, "I explained why I hit you and I apologized." At this point, Janie and Bill, Chuck and Dee Dee, were seated at the dining room table. The four parties conversed for approximately 15 minutes without any threats being made by anyone. Bill got up to go to the bathroom; while he was gone, Janie suggested that perhaps Chuck and Dee Dee should go to bed.
At trial, Dee Dee testified that when Bill returned from the bathroom he was a "different person", meaning that he was very angry. Janie testified that Bill was not angry, but that he did ask Chuck to leave. Chuck apparently refused to leave, stating that he wanted to get everything worked out. Janie testified that Chuck stood up and said, "You're not going to hire me on the shrimp boat" and "you are a dead m____ f____." Chuck walked over to where Bill was sitting and either pushed or hit Bill and a fight ensued.
Dee Dee testified that Chuck picked up a chair and threw it in the direction of Bill's right leg. Janie testified that Chuck had kicked the chair and knocked it into the kitchen doorway, but she also testified that she did not observe him throw a chair at Bill. In any event Chuck was standing over Bill, who was lying on the floor and Janie also testified that she did not see any weapon in Chuck's hands during the altercation.
Bill testified that when he had gone to the bathroom earlier, he had picked up his 38 caliber pistol and placed it in his pocket. Chuck approached him and struck him on the left shin with a broken chair leg. Apparently fearing for his safety, Bill took out his gun and said "Chuck you are not going to kill me in my own house, get out." Chuck grabbed Bill by the hair, in the process ripping out a chunk of it, and a struggle took place. When the gun was free, Bill fired the weapon. Bill claimed that he was flat on his back when he shot Chuck and was partially trapped by a chair and table. He also stated that he shot Chuck as a last resort, to preserve his life *818 and the life of his family. Janie was pregnant at the time.
The bullet from Bill's gun struck Chuck in the left upper portion of his torso, piercing his heart and killing him. Janie called the police, who arrived soon thereafter. When asked what had happened, Bill replied "I just shot the s____-of-a-b____." After Bill posted bond the next day, he went to the emergency room of Gulfport Hospital and was treated for a small laceration on the left side of his upper lip, a swollen right hand and an abrasion on his left shin. He also had a broken rib. However, these injuries did not require hospitalization. Butler was tried on November 4-6, 1985, and was found guilty of manslaughter.

II.

DID THE TRIAL COURT ERR IN REFUSING THE DEFENDANT'S JURY INSTRUCTION D-10?
William Butler argued at trial that he had shot Charles Lassabe in self-defense. It was his contention that Lassabe instigated the incident and that he was only protecting himself and his family. Therefore, he requested a jury instruction on self-defense. His self-defense instruction, D-10, read as follows:
The court further instructs the jury that the defendant was entitled to act upon appearances, and if the conduct of the deceased was such as to induce in the mind of a reasonable person (under all circumstances then existing and viewed from the defendant's standpoint) a fear that death or great bodily harm was about to be inflicted on him by the deceased then it does not matter if there was no such danger, provided that the jury believe that the defendant acted in self-defense from a real and honest conviction. Therefore, if under the circumstances, you find that the defendant acted in necessary defense of himself you shall find him "not guilty."
The assistant district attorney objected to this form of the jury instruction.
The trial judge reviewed this instruction and gave a different instruction based on an earlier instruction filed by Butler's previous counsel. The amended instruction, marked D-9(A) read as follows:
The court instructs the jury that the killing of a human being is justified if the defendant was acting in necessary self-defense because he had reasonable grounds to fear under all the circumstances in evidence that he was in danger of great personal injury and that there was imminent danger of such bodily harm occurring. If you find that the homicide is justifiable in accordance with all of the instructions herein granted, then you will find the defendant not guilty.
Both parties, including Butler's defense counsel, stated that they had no objection to the amended instruction.
This Court has long held that the failure of a party to object to a jury instruction at the trial level bars that person's right to challenge the jury instruction on appeal. Moawad v. State, 531 So.2d 632, 635 (Miss. 1988); Cole v. State, 525 So.2d 365, 374 (Miss. 1987); Lockett v. State, 517 So.2d 1317, 1332-1333 (Miss. 1987). Not only did counsel for Butler fail to object to the jury instruction, in fact, he acquiesced in the giving of that instruction. Therefore, it is the opinion of this Court that he cannot now be allowed to complain about the failure of the court to grant his original jury instruction, and therefore, this assignment of error is without merit.

III.

DID THE TRIAL COURT ERR IN REFUSING TO GRANT THE APPELLANT'S JURY INSTRUCTIONS D-11 AND D-12?
Jury instructions D-11 and D-12 address the right of the appellant, William Butler, to defend his home. During the discussion of the jury instructions, the trial court found problems with the language used in each of the instructions and refused them. However, this Court has held that if the instructions, taken together, adequately instruct the jury on the law of the case, that there is no error in the refusal of a particular instruction. Such is the case with the *819 refusal of these two instructions on defense of the home. It is the opinion of this Court that this assignment of error is meritless.

IV.

DID THE TRIAL COURT ERR IN NOT GRANTING APPELLANT'S PEREMPTORY INSTRUCTION?

DID THE TRIAL COURT ERR IN OVERRULING THE MOTION FOR A NEW TRIAL OR ALTERNATIVELY FOR JUDGMENT NOTWITHSTANDING THE VERDICT?
As part of his jury instructions, Butler requested a peremptory instruction, requesting that the court direct the jury to find him not guilty. The court refused to grant such an instruction. Butler now challenges this refusal.
By requesting a peremptory instruction, a party is essentially asking for a directed verdict. This Court has often stated the standard of review to be used on motions for a directed verdict:
In passing upon a motion for a directed verdict, all evidence introduced by the State is accepted as true, together with any reasonable inferences that may be drawn from that evidence, and, if there is sufficient evidence to support a verdict of guilty, the motion for directed verdict must be overruled.
Guilbeau v. State, 502 So.2d 639, 641 (Miss. 1987).
A motion for judgment notwithstanding the verdict, after the jury verdict is returned, essentially tests the legal sufficiency of the evidence that supports a guilty verdict. The standard of review for such claims is familiar:
The motion for judgment of acquittal notwithstanding the verdict tests the legal sufficiency of the evidence supporting the verdict of guilty. It is in effect a renewal of the defendant's request for a peremptory instruction made at the close of all the evidence. It asks the court to hold, as a matter of law, that the verdict may not stand and that the defendant must be finally discharged.
Where a defendant has moved for jnov, the trial court must consider all of the evidence which supports the State's case  in a light most favorable to the State. The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss. 1973). If the facts and inferences `so considered' point in favor of the defendant with sufficient force that reasonable men could not have found `beyond a reasonable doubt' that the defendant was guilty, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion  that is, evidence of such quality and weight that having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions  the motion should be denied.
Parker v. State, 484 So.2d 1033, 1036 (Miss. 1986).
Considering all the evidence in this case in a light most favorable to the State, there is little question that the peremptory instruction and the motion for judgment notwithstanding the verdict was properly denied. There was a great deal of conflicting evidence in this case about whether the killing of Charles Lassabe, which the appellant never denied, was indeed in self-defense or whether it was manslaughter. The trial court properly denied the motion for judgment notwithstanding the verdict.
A motion for a new trial on the other hand, tests the weight of the evidence, rather than the sufficiency. Our standard of review for such cases is equally familiar.
As to a motion for a new trial, the trial judge should set aside the jury's verdict only when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence; this Court will not reverse unless convinced the verdict is against the substantial weight of the evidence. *820 Russell v. State, 506 So.2d 974, 977 (Miss. 1987); Burt v. State, 493 So.2d 1325, 1328 (Miss. 1986).
Once again, after reviewing the entire record, this Court holds that the trial judge did not abuse his discretion in refusing to grant the motion for a new trial. A great deal of conflicting evidence was presented in this case; on such a "close call," it cannot be said that the verdict was against the "substantial weight of the evidence." (Emphasis added). Therefore, the motion for a new trial was properly denied. After concluding that the peremptory instruction, the motion for judgment notwithstanding the verdict and the motion for new trial were properly denied, these assignments of error are without merit.

V.

DID THE TRIAL COURT ERR IN THE IMPOSITION OF SENTENCE?
The appellant was indicted for manslaughter, the penalty for which is addressed in Miss. Code Ann. § 97-3-25 (Supp. 1988). Pursuant to this statute, anyone convicted of manslaughter shall be fined in a sum "not less than $500, or imprisoned in the county jail not more than one year, or both, or in the penitentiary not less than two years, nor more than twenty years." In the original sentence handed down by the trial court, the appellant was sentenced to the full twenty years term, although execution of that sentence was suspended on conditions.
Butler was given probation for five (5) years, with additional probationary terms as follows:
(A) Defendant shall hereafter commit no offense against the laws of this or any state of the United States, or of the United States;
(B) Avoid injurious or vicious habits;
(C) Avoid persons or places of disreputable or harmful character;
(D) Report to the Department of Corrections, as directed by it;
(E) Permit the field officer to visit him at home, or elsewhere;
(F) Work faithfully at suitable employment so far as possible;
(G) Remain within a specified area to-wit: ____;
(H) Remain within the State of Mississippi unless authorized to leave on proper application therefor;
(I) Support his dependents;
(J) That I do hereby waive extradition to the State of Mississippi from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Mississippi.
(K) Shall pay to the Department of Corrections the sum of $15.00 per month by "certified check" or "money order," until discharged from supervision, per Mississippi Code section 47-7-49 Annotated.
(L) And further, that he pay $10,000.00 to his family[1]in Laurel, Mississippi by February 1, 1987, pay funeral expenses of $3,000.00 within six (6) months from date of this order and pay $100.00 for support on Chuck Lassabe beginning on February 1, 1987 for full five years on probation.

(M) Submit, as provided in section 1 of House Bill 54, 1983 Regular Session, to any type of breath, saliva, or urine chemical analysis test, the purpose of which is to detect the possible presence of alcohol or a substance prohibited or controlled by any law of the State of Mississippi or the United States. (Emphasis added).
The record denotes no objection to any of the probation conditions at the sentencing hearing. In fact, the sentencing order denotes that Butler "accept[ed] the above probation in accordance with the terms thereof" by his signature affixed at the bottom of the page. Neither is there an objection raised in Butler's motion for a new trial about the restitution ordered.
*821 It is William Butler's contention on this appeal that the trial court erred in requiring him to pay child support for the child of the girlfriend of Chuck Lassabe, the deceased. During her testimony, Dee Dee maintained that Chuck was the father of the child she was carrying at the time of the shooting. It is not disputed that Dee Dee was Chuck's girlfriend. Neither is it disputed that she was married to someone else at the time of the shooting and was not divorced until February of 1986.

A.
Under Miss. Code Ann. § 47-7-33 (Supp. 1988) any circuit court or county court which has original jurisdiction over a criminal action has authority to "suspend the imposition or execution of sentence, and place the defendant on probation as herein provided, ..." Cobb v. State, 437 So.2d 1218, 1221 (Miss. 1983). In this case the trial judge found that based on the circumstances of this case, he was justified in suspending the sentence originally given to the appellant, with certain other terms of probation added.
Pursuant to § 47-7-35, Miss. Code Ann. (1972 and Supp. 1988), the legislature listed a group of conditions or terms of probation that the trial court in its discretion may ormay not require of a guilty party. In the case before this Court now, the trial judge required most of the terms listed in this statute. The list is not all inclusive, for the statute provides that the trial court shall determine the terms and conditions and may include among them the statutorily enumerated list "or any other" term or condition. It is reasonable that among "other" conditions of probation, a trial court would consider the statutorily authorized restitution to victims of crime under Miss. Code Ann. § 99-37-1, et seq. Under § 99-37-3, the restitution statute specifically provides that a convicted defendant may be required to pay restitution in addition to any other sentence that the trial court may impose.
Miss. Code Ann. § 99-37-1 defines several terms that are relevant to a reading of this act, including "criminal activities," "pecuniary damages," "restitution" and "victim." For purposes of these statutes, the term "victim" encompasses "any person whom the court determines has suffered pecuniary damages as a result of the defendant's criminal activities." Miss. Code Ann. § 99-37-1(d). Therefore, it appears that the payment of restitution is not limited only to the person that has been directly injured by a guilty party; the payment of restitution can also be extended to members of the victim's family who suffer pecuniary damages.
"Pecuniary damages" are defined as "all special damages, but not general damages, which a person could recover against the defendant in a civil action arising out of the facts or events constituting the defendant's criminal activities ..." with respect to which the defendant is convicted. Although the authority to impose restitution flows from the adjudication of guilt or the defendant's plea of guilty, that is not to say that restitution may not be imposed at any stage of the criminal process through informal, government-sanctioned compromises and settlements between offender and victim so long as detention is not used to induce an agreement. Falco, Inc. v. Bates, 30 Ill. App.3d 570, 334 N.E.2d 169 (1975). From an analysis of these statutes, the trial court has the authority to impose restitution.

B.
Separating the authority to impose restitution from the procedure to impose, the Victim Restitution Act has additional directives. Under § 99-37-3(3) the defendant has the right to object to "the imposition, amount or distribution of the restitution" at the time of sentencing.
Additionally, under § 99-37-3(4) if the Court determines that restitution is inappropriate or undesirable for some reason, an order stating the reasons for such a finding shall be entered, stating the circumstances for such a determination. Sections (3) and (4) of § 99-37-3 indicate the necessity for a hearing before restitution can be assessed. The type hearing is not specified, but would require at a minimum, (1) *822 notice to the defendant that victim restitution was being considered by the court, (2) the nature of such restitution considered, (3) an opportunity to the defendant to be heard and to object, and (4) a finding by the court to afford adequate appellate review. "... (P)ersons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 118 (1971). However, the language of Section (4) suggests that there are cases in which restitution would not be appropriate, as when the victim's loss is difficult to quantify. Victim Restitution in the Criminal Process: A Procedural Analysis, 97 Harvard L.Rev. 931, 933 (1984).
Lastly, § 99-37-17(1) notes that "nothing in this chapter limits or impairs the right of a person injured by a defendant's criminal activities to sue and recover damages from the defendant in a civil action," but the restitution paid by the defendant will be credited against civil judgment.
Very few cases decided by this Court have addressed this restitution issue directly. More often than not, restitution is only a tangential issue in an appeal made to this Court. In recent history, two cases decided by this Court have addressed the subject of restitution in light of the Restitution to Victims of Crimes Act. In Powell v. State, 536 So.2d 13 (Miss. 1988), this Court upheld the trial court's order that the appellant be required to pay almost $10,000 worth of medical expenses in the form of restitution. However, it is worth noting that in Powell, supra, the trial judge held a separate proceeding to determine sentencing. There is no evidence in the case before us of such a proceeding ever taking place.
In Fanning v. State, 497 So.2d 70 (Miss. 1986), the Court upheld the trial court's assessment of restitution against the appellant in the form of repayment of the costs of a special election to the State of Mississippi in the amount of approximately $3,000. This Court found that the trial court was specifically authorized to make such an assessment; therefore, the conviction of the appellant was affirmed.
There are decisions from other jurisdictions which address this issue. State v. Mayberry, 415 N.W.2d 644 (Iowa 1987), (upheld a restitution award of approximately $60,000 to the parents of a twenty-one year old college student who had been murdered by the defendant); People v. Wager, 129 Mich. App. 819, 342 N.W.2d 619 (1983), (upheld the payment of $30.00 per week for each of two children of the deceased victim); State v. Moore, 156 Ariz. 566, 754 P.2d 293 (1988) (upholding an award for economic loss of $2,554); State v. Crowder, 155 Ariz. 477, 747 P.2d 1176 (1987) (upholding an award for economic loss of $37,000); People v. Quinonez, 735 P.2d 159 (Colo. 1987) (medical expenses); Mellott v. State, 496 N.E.2d 396 (Ind. 1986) (a fine of $10,000 plus court costs); State v. Killian, 37 N.C. App. 234, 245 S.E.2d 812 (1978) ($500.00 larceny plus attorney's fees); People v. Harrison, 82 Ill. App.3d 530, 402 N.E.2d 822 (1980) (phone and travel expenses); U.S. v. Golomb, 811 F.2d 787 (2nd Cir.1987) (burglary  amount of loss and fine).

C.
Having reviewed the legal authority of this and other jurisdictions and the procedural requirements of the Mississippi statute, this Court now addresses the issue before this Court of:
(1) whether child support to the victim's child is within the statutory definition of pecuniary damages allowed and
(2) whether the child is a legally eligible recipient.
"Pecuniary damages" allowable under the statute are "all special damages, but not general damages, which a person could recover against the defendant in a civil action arising out of the facts or events constituting the defendant's criminal activities and shall include, but not be limited to, the money equivalent of property taken, destroyed, broken or otherwise harmed, and losses such as medical expenses". Miss. Code Ann. § 99-37-1(b) (Supp. 1988). The statutory language is not *823 narrowly drawn to limit restitution to restoration of property. But the statute permits all special damages recoverable from a civil suit arising from the criminal act. The use of the words "all special damages" recoverable from a civil suit denotes more than just restoration of "property." Miss. Code Ann. § 99-37-1(c) defines restitution to be "full, partial or nominal payment of pecuniary damages to a victim." Harland, Monetary Remedies For the Victims of Crime: Assessing The Role of Criminal Courts, 30 U.C.L.A. Law Review 52, 89 (1982). Taking the two statutory sections together, the statute provides for repayment of financial loss to victims who have been wrongfully deprived of a reasonable expectation of pecuniary benefit from the continued life of the deceased had he lived. The financial loss has to be quantifiable, and it would not include damages for loss of love and affection, mental anguish, or loss of companionship and society.
The ordering of child support to the victim's child is a type of special damages that is encompassed under the statute and a quantifiable sum can be ascertained for the child's needs. The fixing of child support restitution may by analogy resort to the law regarding setting the amount of child support in divorce cases. It is noted that the duration of such payments is for five years during which the defendant is on probation. This Court, therefore, holds that child support to the victim's child is within the statutory definition of pecuniary damages ascertainable in a quantifiable sum.
Lastly, the Court addresses whether the victim's child is a legally eligible recipient. It is noted that the child in question was alleged to be the child of Chuck Lassabe and Dee Dee Carter.
As noted earlier, Dawn Carter (Dee Dee) was married to someone else at the time Chuck Lassabe was killed by the appellant. Under Mississippi law there is a strong presumption that the child of a married woman was fathered by her husband.
The presumption that a child born in wedlock is the legitimate child of the husband is one of the strongest presumptions known to law and may be overcome only by proof beyond a reasonable doubt that the husband is not the father.
Deer v. State Department of Public Welfare, 518 So.2d 649, 652 (Miss. 1988); Baker v. Williams, 503 So.2d 249, 253 (Miss. 1987); Brabham v. Brabham, 483 So.2d 341, 343 (Miss. 1986).
In the case sub judice, there does not appear in the record any evidence of a hearing ever being held to determine the actual paternity of the child later born to Dawn Carter. Dawn Carter's former husband would have been a necessary party to such a determination; in the absence of a paternity hearing, the presumption that Carter's husband is the father remains. Therefore, in the absence of such a determination, with all necessary parties noticed, this Court holds that the presumption of legitimacy controls and that this minor child was not a legally eligible recipient. This result must obtain even in the face of Butler's acceptance of this condition of probation. Therefore, the provision of probation ordering that child support be paid to Chuck Lassabe is held to be void and is eliminated as a condition of probation. All other conditions remain valid.
It is the holding of this Court that the sentence of twenty (20) years suspended with five (5) years on probation under the stated conditions was authorized and is affirmed with the one exception of the $100.00 per month child support to Chuck Lassabe which requirement is voided.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
PITTMAN, J., not participating.
NOTES
[1] The record reflects that appellant was married before and that his former wife was seeking "more" money from him. It appears from the document in the record that the trial judge required appellant to pay his former wife this money.