783 So.2d 744 (2000)
Jerome KELLY a/k/a Jerome H. Kelly a/k/a Jerome Howard Kelly, Appellant,
v.
STATE of Mississippi, Appellee.
No. 98-KA-00726-COA.
Court of Appeals of Mississippi.
October 3, 2000.
Rehearing Denied January 9, 2001.
Certiorari Denied May 3, 2001.
*747 Joseph P. Hudson, James Donald Evans III, Gulfport, Attorneys For Appellant.
Office Of The Attorney General By Scott Stuart, Jackson, Attorney For Appellee.
BEFORE McMILLIN, C.J., LEE, AND THOMAS, JJ.
LEE, J., for the Court:
¶ 1. Jerome Kelly was indicted for burglary and murder pursuant to Miss.Code Ann. §§ 97-17-19 and 97-3-19 (Rev.1994), as amended, respectively, and found guilty of trespass and murder on March 5, 1998 by a Pearl River County Circuit Court jury. He was sentenced to six months for trespassing and life imprisonment for murder. He appeals his conviction, assigning as error fifteen issues which we have consolidated into nine. After a thorough review of the record, we find no reversible error and affirm.

*748 FACTS
¶ 2. The events leading to this gruesome murder began in May of 1996 when Jerome Kelly and Sheila Sanders first met. At that time Kelly was living with Marcie Turnpaugh and had been since 1991, except for a period when Kelly was in Parchman. About a week after he met Sanders he began staying with her several nights a week at her apartment at Beechwood Apartments, a low income housing project in Picayune. Because convicted felons were prohibited from residing or loitering on the premises, he did not actually move in with Sanders. Rather, Kelly testified that he continued to stay with Turnpaugh and told her that he was at a night job on the nights that he spent with Sanders. He said that he did this because Turnpaugh had notified the police several times that Kelly was at Sanders's apartment in violation of the trespass law in an effort to prevent further development of the relationship between Sanders and Kelly.
¶ 3. On June 19, 1996, about a month after Sanders and Kelly met, the two had an argument. Kelly had gone to Sanders's apartment in Turnpaugh's car. According to the statement later given by Sanders, Kelly knocked on her door and kicked it in when Sanders refused to open it. Kelly testified that the argument was in regard to money he had given Sanders to pay a bill that she instead used to buy marijuana. During this argument Kelly and Sanders slapped each other. Just as Kelly was about to leave Sanders's apartment, Turnpaugh arrived with McArthur Washington, a relative of Kelly's by marriage. Kelly and Turnpaugh began arguing at that point and slapped each other. Turnpaugh wanted Kelly to return the keys to her car to her. Sanders started crying and asked Kelly to make up his mind between her and Turnpaugh. Meanwhile, Cachandria Terrell, Sanders's downstairs neighbor, heard the arguing and went to Sanders's apartment. Terrell said everyone was arguing and Sanders discreetly motioned to her to call the police. Kelly testified that Terrell said she was going to call the police, and he replied that he was going to push Sanders down the steps if Terrell did not get out of his way. Terrell said that Kelly then dragged Sanders to the balcony and cradled her over it and said he was going to throw her over the balcony if Terrell did not turn around. Terrell did not call the police at that time, and Kelly then dragged Sanders down the stairs and forced her into Turnbaugh's car, to which Kelly still had the keys. Terrell said that she, along with someone else, tried to pull Sanders out of the car but Kelly put it in reverse and pulled off. Terrell said she feared for Sanders's life. Kelly stopped the car in the adjacent parking lot to let Turnbaugh in the car.
¶ 4. Kelly said that he, Sanders, and Turnbaugh drove to Carriere where they stopped at a ballpark and Kelly got out of the car. Turnbaugh then got into the driver's seat and drove off and tried to run over Kelly. Kelly jumped on the hood of the car in an effort to get Turnbaugh to stop. She drove about a mile with Kelly on the hood. Turnbaugh said she then stopped the car, and Kelly kicked the windshield in when she would not open the door to let him in. After breaking the windshield, Kelly cleaned the glass off the car and Turnbaugh gave him a ride to call his sister. Sanders was crying. Kelly's sister gave him and Sanders a ride. Turnbaugh went home, called the police, and gave a statement. Kelly said he knew that Turnbaugh had called the police so he had his sister take him to the police department where Kelly was arrested, and Sanders was questioned and ultimately made a statement.
¶ 5. Though Sanders did not file charges against Kelly regarding this incident, Officer *749 Ray Carlisle of the Picayune Police Department filed an affidavit against Kelly on the basis of his investigation. Kelly was charged with kidnaping and burglary and those charges were still pending at the time of Sanders's death.
¶ 6. At some time during the night of July 27 or the early morning hours of July 28, Stephon Huderson went to Sanders's apartment and went to sleep with her in her bedroom. Huderson made a statement to the police at 9:38 a.m. regarding what ensured, less than four hours after Sanders was reported to have been killed. The statement was consistent with his testimony at trial and was corroborated with an abundance of physical evidence. The statement reads as follows:
About 0600 hrs I woke up and saw Jerome rip open the screen on the window and jump into the window. Jerome started hitting on Shiela in the face and told her "why did you press charges on me." I told Jerome that she did not press charges on him. Jerome went out of the bedroom and came back with something wrap up in a white t-shirt. Jerome grabbed Shiela and told her to come to the living room. So she did. I started to get dress and was fixen to leave. I heard Shiela screaming my name so I got up with no shoes on and went into the living room. When I entered the living room I saw Jerome on top of Shiela on the sofa choking her. Jerome turned his head and saw me and got off of her. Shiela got up and started vomiting blood. Jerome grabbed the knife from the shirt and stabbed her in the chest. After this happened I ran to the bedroom and dove through the window. Jerome jumped out of the window after me with the knife still in his hand. I started running away but Jerome was still chasing me with the knife. I told Jerome to put the knife down but he wouldn't. Jerome kept telling me "You won't tell on me, you won't be a witness." I told Jerome to put the knife down, but he still did not. So I ran to the street and flagged down a car. The car stopped and I grabbed the passenger rear door. Then Jerome said "good a ride" and I did not entered the vehicle and closed the door. I told Jerome to put the knife down before he got into the car. Jerome threw the knife across to street and jump in the driver rear seat and the car drove off. I ran to my sister house on South Beech Street and called the police.
¶ 7. A passenger in the car testified that when Kelly got to the car he told the driver and passenger that he had been in a fight and needed a ride to Picayune. Kelly got in the back seat. The driver later stopped and got out of the car to make a phone call. The passenger got out of the car as well. Kelly got into the driver's seat at that time and drove away. The car was found a few days later in Louisiana, and Kelly eventually turned himself in to the Picayune Police Department.
¶ 8. Kelly, in his version of events, says that he went to Sanders's apartment with the intention of getting some rest. He claims that because Sanders slept hard she did not answer the door when he knocked, and he therefore climbed into the window to gain entry. When he got in the bedroom and saw another man with her he got mad and slapped her. According to Kelly, it was Sanders who initially had the knife. He said that he snatched it from her and slung her to the couch prior to killing her.
¶ 9. The autopsy showed four lethal stab wounds to Sanders. Expert testimony was that any one of the four would have killed her. One of the lethal wounds went through the sternum, the breast plate, and into her heart. It then went into the left lung. There were also three non-lethal *750 stab wounds and numerous slash wounds indicating a defensive posture. In addition the autopsy report disclosed multiple bruises determined to have occurred just prior to Sanders's death.

ISSUES AND DISCUSSION

IIII. THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE THAT KELLY BURGLARIZED SANDERS'S APARTMENT AND THEN KIDNAPPED HER IN VIOLATION OF M.R.E. 403, M.R.E. 404(a)(1), AND M.R.E. 404(b).
¶ 10. Kelly argues that the trial judge erred when he admitted evidence of the burglary and kidnaping which occurred on June 19, 1996. He argues that the proof was more prejudicial than probative and therefore in violation of M.R.E. 403. We disagree. Generally, the admissibility of evidence rests within the trial court's discretion. Harvey v. State, 666 So.2d 798, 800 (Miss.1995).
¶ 11. After a thorough reading of the record, it is the opinion of this Court that this evidence was relevant to show Kelly's intent and motive to kill Sanders. Motive is an appropriate purpose for the admission of evidence of prior bad acts or other crimes under M.R.E. 404(b). Huderson testified that when Kelly broke into Sanders's apartment on the morning that she was killed Kelly said, "Man, I'm gonna kill that b____ cause she keep pressing charges on me every time I pass in front of her house. She presses charges on me." Huderson's above statement to the police also makes reference to charges. This statement regarding charges made just before the crime was committed renders the nature of the charges more probative in determining motive than such evidence would be prejudicial, and we do not find it to have been admitted in violation of M.R.E. 403.
¶ 12. In addition, we do not believe that the subject evidence was presented, as Kelly asserts, to show his character or propensity to act in a certain manner in violation of M.R.E. 404(a)(1). The evidence of the kidnaping and burglary presented as prior bad acts corroborated the State's theory that Kelly killed Sanders because he believed she had filed criminal charges against him for those actions, and he wanted her to stop filing the charges against him for those acts. This is evidence of motive and is admissible under M.R.E. 404(b).
¶ 13. Because Sanders herself did not file charges does not indicate that this evidence was not probative and should not have been admitted. The record shows that Officer Ray Carlisle said that he filed the charges because victims are often reluctant to do so themselves. Carlisle said that Sanders would have ultimately been required to testify against Kelly regarding those charges regardless of who actually filed them. We have no reason to believe that Kelly understood the procedure involved in filing such charges. Therefore, the focus should not be on who filed the charges for the incident, rather, it should be on the fact that Kelly perceived that charges against him had been filed and that pursuing those charges necessitated that Sanders to testify against him. Kelly himself testified that he had been to court twice for preliminary hearings regarding the charges emanating from the incident of June 19 in the forty days between the time of the incident and the time of Sanders's death on July 28. It is therefore obvious that he knew that charges had been filed and it is reasonable to infer that he held Sanders responsible for those charges having been filed, regardless of whether she or someone else actually filed them.
¶ 14. Kelly cites Eubanks v. State, 419 So.2d 1330 (Miss.1982), in support of his *751 argument that the incident of June 19 should not have been admitted into evidence. In Eubanks, the court determined that the prior crime was not so connected that it could not be separated from the crime for which the appellant was being tried. Id. at 1332. We do not so conclude in light of the fact that there was evidence presented that Kelly made specific reference to charges having been filed when he broke into Sanders's apartment just prior to killing her.
¶ 15. In addition, the record shows that counsel for Kelly, out of the presence of the jury, told the judge that he needed to ask Huderson about the prior charges in order to show that Sanders did not file those charges. It was only logical at that point to allow further testimony regarding the incident of June 19 to show that the charges were filed even though Sanders herself did not file them. Furthermore, the record shows that Kelly's counsel himself asked Kelly on direct examination to tell the jury about the incident which occurred on June 19 and allowed Kelly to go into great detail. Being that this is the incident which gave rise to the charges for burglary and kidnaping, Kelly cannot now complain that it was error to admit this evidence.
¶ 16. Kelly also argues that the evidence of the bad acts of the June 19 incident does not fall under the exception permitted under M.R.E. 404(b). Though his argument is vague, it appears that he claims that evidence of Kelly's character through prior bad acts is admissible only if evidence of Sanders's character had been presented. It appears Kelly has confused M.R.E. 404(a)(2) with M.R.E. 404(b). Again, we find that the prior acts were allowed to show motive under M.R.E. 404(b). The State offered the evidence to corroborate its theory that Kelly's motive was to silence Sanders in order to stop her from bringing charges against him.

IV. THE FAILURE OF THE STATE TO RECORD THE GRAND JURY PROCEEDINGS DID NOT DENY KELLY A FAIR TRIAL BY PLACING HIM IN DOUBLE JEOPARDY.
¶ 17. Kelly contends that the State's failure to record and to provide him a copy of the transcript of the grand jury proceeding denied him a fair trial because it resulted in the issuance of two separate indictments allowing the State to introduce evidence during the murder trial that Kelly stole a car during his escape. We find no authority which gives Kelly the right to the minutes of the grand jury, even had they existed. Kelly must show a particular need which outweighs the need for maintaining the secrecy of grand jury proceedings, Reining v. State, 606 So.2d 1098, 1101 (Miss.1992), which he did not show.
¶ 18. It appears that Kelly is asserting a need to have the transcript of the proceedings to show that the State, in having had two indictments returned against him, had an unfair advantage in presenting the evidence of the car theft during the murder trial. We do not find that the resulting separate indictment for grand larceny of the car resulted in any advantage to the State. The State was not able to admit the evidence of the grand larceny because of the fact that Kelly was charged with that crime in a separate indictment. Rather, because Kelly was indicted separately for grand larceny, the State was first required to demonstrate the relevance of the grand larceny to the charge of murder. The State then had to show that the evidence was more probative than prejudicial. M.R.E. 403. Had the State tried Kelly for murder in the same trial as larceny, the State would have had only to have shown that the evidence was relevant to prove larceny. The evidence *752 was admitted because the State bore its burden.
¶ 19. Kelly also argues that he was denied due process being twice placed in jeopardy by having evidence of the larceny admitted during his trial for murder. Some or a substantial overlap of evidence for different crimes that occur at the same time is not unusual. Bannister v. State, 731 So.2d 583 (¶ 12) (Miss.1999). Double jeopardy does not arise merely because much of the same proof is introduced to support multiple convictions. The admission of the evidence of larceny did not twice prosecute or imprison Kelly for larceny. Kelly was not being prosecuted for larceny in this case. He was facing charges for murder and burglary. Prohibiting multiple prosecutions and imprisonments for a single crime is the purpose of the double jeopardy clause in the Fifth Amendment of the United States Constitution.

V. THE COURT DID NOT ERR IN ADMITTING EVIDENCE OF GRAND LARCENY IN VIOLATION OF M.R.E. 404(b).
¶ 20. The evidence of the larceny of the car was offered as proof of Kelly's escape which occurred immediately after he stabbed and killed Sanders. Evidence of a crime other than that charged in the indictment is not generally admissible against the accused. However, there is an exception to this exclusion when the other crime is so interrelated to the crime charged as to form a single transaction or closely related series of transactions. Townsend v. State, 681 So.2d 497, 506 (Miss.1996). The evidence clearly demonstrated such a relationship. The record shows that a piece of vinyl retrieved from the seat of the car was stained with blood which matched Sanders's DNA. In addition, the theft of the car is admissible as proof of flight and therefore as evidence of conscious guilt. Williams v. State, 667 So.2d 15, 23 (Miss.1996). It is therefore admissible to show knowledge. M.R.E. 404(b).
¶ 21. Our standard of review in determining if the evidence admitted was more prejudicial than probative is whether the trial court abused its discretion. Bogard v. State, 624 So.2d 1313, 1316-17 (Miss.1993). We agree with the trial court that the probative value of this evidence outweighed any unfair prejudice resulting, as required for admission by M.R.E. 403, and do not find that the court abused its discretion in admitting the evidence.

VI. THE COURT DID NOT ERR IN DENYING A MOTION FOR JNOV OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.
¶ 22. Kelly argues that his motion for JNOV should have been granted because the State failed to prove beyond a reasonable doubt that Sanders's death was a result of premeditated acts or by deliberate design on the part of Kelly; therefore, her death was not the result of murder. Kelly asserts that the jury's finding of Kelly's guilt of the lesser offense of trespass, rather than burglary, shows that he had no intent to kill Sanders when he broke into the apartment.
¶ 23. The cases are clear that deliberate design to commit murder can be established in a short period of time any time prior to the consummation of the act. Duvall v. State, 634 So.2d 524, 525 (Miss. 1994). Thus, the inference that the jury did not believe that Kelly entered the apartment with the intent to kill Sanders because it did not find Kelly guilty of burglary is of no import since his intent to kill could have been formed after he gained entry to Sanders's apartment.
*753 ¶ 24. In assessing the legal sufficiency of the evidence on a motion for JNOV, the trial judge is required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom and to disregard evidence favorable to the defendant. Yates v. State, 685 So.2d 715, 718 (Miss.1996); Ellis v. State, 667 So.2d 599, 612 (Miss.1995); Noe v. State, 616 So.2d 298, 302 (Miss.1993); Clemons v. State, 460 So.2d 835, 839 (Miss.1984);. If under this standard sufficient evidence to support the jury's verdict of guilt exists, the motion should be overruled. Brown v. State, 556 So.2d 338, 340 (Miss.1990); Butler v. State, 544 So.2d 816, 819 (Miss.1989).
¶ 25. Accepting as true all the evidence favorable to the State, as we are required to do, we find that Huderson testified that when Kelly broke into Sanders's apartment through her bedroom window, he said he was "going to kill that b____." This evidence standing on its own is enough to support the jury's finding that the necessary element of malice aforethought existed in order to support the murder conviction. Russell v. State, 497 So.2d 75, 76 (Miss.1986). It would be irrational to deny, as Kelly in essence asks us to do, that this statement shows intent. In addition, Huderson said that he heard Kelly in the kitchen and he came back with something wrapped in a white shirt. Kelly then called Sanders to the living room where Huderson heard her scream. When Huderson went to the living room he saw Kelly vomiting blood and Kelly stabbing her. Certainly this sequence of events infers intent as well. We find the evidence legally sufficient to support the jury's verdict of guilt and that the motion for JNOV was properly overruled. Brown v. State, 556 So.2d 338, 340 (Miss.1990); Butler v. State, 544 So.2d 816, 819 (Miss.1989).
¶ 26. Kelly seeks alternative relief in the form of remand to the trial court for a new trial. The former is a consequence of legal insufficiency of the evidence while the latter is the product of an examination of evidentiary weight. May v. State, 460 So.2d 778, 781 (Miss. 1984). Where the weight of the evidence, as opposed to the sufficiency, is challenged, the jury's verdict is vacated on grounds relative to the weight of the evidence so that a new trial is granted as opposed to final discharge. Id. In determining whether a jury verdict is against the overwhelming weight of the evidence the court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Herring v. State, 691 So.2d 948, 957 (Miss.1997) (citing Thornhill v. State, 561 So.2d 1025, 1030 (Miss.1989)). Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will it be disturbed on appeal. Benson v. State, 551 So.2d 188, 193 (Miss.1989) (citing McFee v. State, 511 So.2d 130, 133-34 (Miss.1987)). "The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Sinclair, 438 F.2d 50, 51 n. 1 (5th Cir.1971). Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict. Mitchell v. State, 572 So.2d 865, 867 (Miss.1990).
¶ 27. The evidence to be evaluated regarding sufficiency for sustaining a conviction for murder and the evidence relevant to ascertaining whether the jury's verdict was against the overwhelming *754 weight will be the same in this case; evidence regarding sufficiency requires the court to accept as true all evidence favorable to the State, Yates, 685 So.2d at 718, and evidence regarding weight limits our review to that construed in the light most favorable to the verdict. Mitchell, 572 So.2d at 867. The jury chose to believe Huderson's eyewitness testimony, corroborated with substantial DNA evidence, rather than accept Kelly's version of events which would have resulted in a conviction for manslaughter. The question of whether a defendant had committed murder or manslaughter is ordinarily a question to be resolved by the jury. Strahan v. State, 729 So.2d 800 (¶ 24) (Miss.1998). In determining whether a jury verdict is against the overwhelming weight of the evidence, the court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Herring v. State, 691 So.2d 948, 957 (Miss.1997). We do not find that the trial court abused its discretion in failing to grant a new trial.

VII. THE TRIAL COURT DID NOT ERR IN GRANTING JURY INSTRUCTIONS S-9 AND S-4.
¶ 28. The Mississippi Supreme Court has clearly stated the standard of review when reviewing jury instructions in Edwards v. State, 737 So.2d 275 (¶ 85) (Miss.1999). In granting or refusing various instructions, the instructions given must be read as a whole. When the instructions are so read they should fairly enunciate the law of the case and create no injustice in order to withstand a finding of reversible error.
¶ 29. Kelly claims that instructions S-9 and S-4 were confusing and misleading to the jury. Instruction S-9 reads:
The Court instructs the jury that while premeditation to kill is a necessary element of the crime of murder, that it does not necessarily mean hatred or ill will and need not exist in the mind of the defendant for any definite time, not for hours, days or even minutes, but if there is a premeditated design to kill and it exists in the mind of the defendant but for a moment before the fatal act, this is sufficient premeditation to constitute the offense of murder, unless the killing is justifiable.
He relies on Windham v. State, 520 So.2d 123 (Miss.1987), and Duvall v. State, 634 So.2d 524 (Miss.1994), as the basis of his assertion that the instruction incorrectly states when the intent to kill must be formed to support a conviction for murder. We distinguish instruction S-9 from the instruction given in Windham in that S-9 states that the premeditated design to kill must have existed before Kelly killed Sanders whereas the Windhaminstruction incorrectly stated that the deliberate design to kill could have been formed at the moment of the fatal act. Windham, 520 So.2d at 126. The instruction on which he relies in Duvall also states that a deliberate design of the slayer existing at the very moment of the act of violence sufficed to constitute murder. Duvall, 634 So.2d at 525. We do not find instruction S-9 confusing and conclude that it correctly states the law.
¶ 30. We also find instruction S-4 to be a correct statement of the law as it correctly instructs the jury regarding the elements of burglary of a dwelling, not as Kelly asserts, the law of murder.

Other Jury Instructions
¶ 31. In addition, Kelly lists five instructions for the defense that he claims were erroneously denied. He complains that instruction D-14 regarding his right and competency to testify as a witness should have been granted. The law does not entitle a defendant to an instruction *755 stating that he has a right to testify on his own behalf and that his testimony should be treated as that of any other witness, Johnson v. State, 452 So.2d 850, 854-55 (Miss.1984), nor does it entitle the defendant to one informing the jury that he is a competent witness. Coleman v. State, 697 So.2d 777, 784 (Miss.1997).
¶ 32. Kelly cites no authority supporting the error he asserts in instruction D-16, we therefore have no duty to consider it. Hoops v. State, 681 So.2d 521, 526 (Miss.1996). Nevertheless, the instruction regarding Kelly's intent is grounds for error, being abstract and not grounded in the evidence presented. Downtown Grill v. Connell, 721 So.2d 1113 (¶ 17) (Miss. 1998). We therefore find no error in its having been refused.
¶ 33. Instruction D-7 instructed the jury not to rely solely on the testimony of expert witnesses in the evaluation of forensic evidence. Kelly claims that the denial of this instruction caused prejudice to him because of the tendency of a jury to give greater weight to the testimony of an expert witness. A review of the instructions given shows that the jury was properly instructed regarding weight and credibility of evidence in instruction C-1, and instruction D-9 properly instructed regarding the presumption of innocence. In granting or refusing various instructions, the instructions given must be read as a whole. Edwards v. State, 737 So.2d 275 (¶ 85) (Miss.1999).
¶ 34. Kelly also argues he was denied a fair trial because of the trial court's failure to grant instruction D-8 which states the law regarding the burden of proof and the elements of the offense. We disagree, finding that the instructions read as a whole properly state the law. Id.
¶ 35. Finally, we find that instruction 12, the refusal of which Kelly asserts as error, is in essence very similar to instruction D-11, which was granted. Instructions should be read as a whole. Id. The court is advised against adding repetitive instructions. Wall v. State, 413 So.2d 1014, 1015 (Miss.1982).

VIII. THE STATE'S CLOSING ARGUMENT DID NOT UNFAIRLY PREJUDICE KELLY.
¶ 36. The trial judge is vested with discretion to determine whether a comment during closing argument is so prejudicial that a mistrial should be declared. Alexander v. State, 602 So.2d 1180, 1182-83 (Miss.1992). In addition, attorneys are to be given wide latitude in making their closing arguments and statements must be considered in context. Wilcher v. State, 697 So.2d 1087, 1110 (Miss.1997). We first note that the record shows that Kelly failed to object to the statements made in the prosecutor's closing argument which he says caused prejudice to him. It is incumbent on defense counsel to raise a proper objection when the offensive language is uttered or waive appellate review of the issue. Hunter v. State, 684 So.2d 625, 637 (Miss.1996) (citing Foster v. State, 639 So.2d 1263, 1287 (Miss.1994)). This assignment of error is therefore procedurally barred.
¶ 37. This Court will nevertheless address the merits. Kelly argues that he was unfairly prejudiced by the State's comment during closing argument which when read in context, referred to the State's having met its burden to establish Kelly's guilt. That comment was: "The State went to a lot of ends to accomplish that." Kelly asserts that this statement was improper because reasonable inferences could be drawn regarding the burden and cost of the trial for the State thereby causing unfair prejudice to him. We do not agree and are unable to find precedent where such has been so held.
*756 ¶ 38. In addition, Kelly argues that the State's comment was improper regarding Kelly's having chosen to testify. The relevant comment was to the effect that Kelly had no choice but to testify in order to refute the State's case. Mississippi law is clear that the State may not comment on a defendant's decision not to testify, Griffin v. State, 557 So.2d 542 (Miss.1990); however, we fail to find precedent in reference to a defendant's decision to testify. Looking at the context of the statement and the case as a whole, we do not find that unfair prejudice resulted to Kelly as a result of this comment, and therefore, find no merit to this claim.

IX. THE TRIAL COURT DID NOT ERR IN ALLOWING THE STATE TO EXERCISE ITS BATSON PEREMPTORY CHALLENGES.
¶ 39. Kelly argues that the State violated the prohibition established in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), against striking jurors purely on the basis of race. We first note that Batson claims apply only to peremptory challenges, not excusals for cause, Brown v. Blackwood, 697 So.2d 763, 772 (Miss.1997); Shaw v. State, 540 So.2d 26, 27 (Miss.1989).
¶ 40. Kelly names two prospective jurors who he claims were struck in violation of Batson. The record shows that the State sought to strike Mr. Gray thinking that he was related to another Gray that it had prosecuted. After questioning Gray regarding this relationship and finding that he was not related to this person, the State withdrew the strike. The only venire person the record shows who did not sit as a juror as a result of a peremptory strike was Ms. Coleman. The State gave as race-neutral reasons for striking her that Coleman stated that she had read about the case in the newspaper, that she had gone to school with the defendant, that she was a friend of Kelly's brother and a friend of other members of Kelly's family, and that she knew witnesses on both sides. The defense objected to the strike, stating that Coleman indicated she could be fair. The court, however, permitted the strike because the State had enunciated raceneutral reasons. Excluding jurors on the ground that they are acquainted with the defendant has been found to be a raceneutral reason to exercise a peremptory strike. Govan v. State, 591 So.2d 428, 430 (Miss.1991). We, therefore, find no merit to the Batsonclaim.
¶ 41. THE JUDGMENT OF THE PEARL RIVER COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I TRESPASSING AND SENTENCE OF SIX MONTHS IN THE PEARL RIVER COUNTY JAIL; COUNT II MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PEARL RIVER COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, MOORE, MYERS, AND PAYNE, JJ., CONCUR. IRVING, J., CONCURS IN PART, DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY THOMAS, J.
IRVING, J., CONCURRING IN PART, DISSENTING IN PART:
¶ 42. Kelly committed a heartless and brutal murder. The murder was witnessed by Stephon Huderson, a person with whom the victim, Sheila Sanders, was sexually involved. The evidence of Kelly's guilt is overwhelming. Consequently, I concur with the majority in affirming his conviction and sentence. However, I disagree with the majority's resolution of several issues in this appeal. Therefore, I *757 write separately to express my views as to the proper resolution of those issues.

1. Evidence regarding the June 19, 1996 incident
¶ 43. Kelly contends that evidence regarding the break-in of Sanders's apartment and the kidnapping of Sanders on June 19, 1996, was admitted in violation of M.R.E. 403, 404(a) and 404(b). The offense for which Kelly was on trial occurred on July 28, 1996. The majority concludes that the evidence was properly admitted to show motive under M.R.E. 404(b). For sure, evidence of other crimes is admissible under M.R.E. 404(b) to prove motive. Motive is never an element of a criminal offense. However, the state's case is always enhanced if the prosecution can offer reasonable evidence of motive. Such offering aids in pulling the pieces of evidence together to tell a sensible story to the jury.
¶ 44. If proof of motive was the purpose of apprising the jury of the June 19 incident, it seems logical that the evidentiary focus would necessarily have to be on the actions of the victim that day, or on her actions emanating from events occurring on that day, which arguably created a motive for Kelly to want to kill her approximately forty days later. If it is not, then surely the focus must be on the acquisition by Sanders of some secret knowledge of Kelly's actions which he did not want exposed and which he thought she might expose if she continued to live. Having established the logical parameters of the motive evidence, I turn now to the contentions of the parties and the evidence offered in support of those contentions.
¶ 45. The State argues that the evidence of the June 19 incident was admissible as proof of motive. Additionally, the State argues that the defense cannot complain about the admission of the evidence because the defense insisted it needed to question Huderson about the charges to prove that no charges were filed by Sanders.
¶ 46. A review of the record reflects that the defense made the statement about the need to ask Huderson about the charges, during Huderson's testimony, after Huderson testified that he talked to Sanders one day after Kelly "supposedly kidnaped her or tried to." Earlier Huderson had testified to the following:
Well, Jerome burst through the window that morning, and he woke me up, and I woke up asking him, "Man, what is you doing?" And Jerome said that, "Man, I'm gonna kill that b____h cause she keep pressing charges on me every time I pass in front of her house. She presses charges on me." I say, "Jerome, that's why she's pressing charges on you because you steady slapping her all around and beating her up, man." "You ain't got nothing to do with her." I said, "Well, you still ain't got no business beating her up like that, Man. That ain't right."
¶ 47. After a bench conference, the trial judge decided he was going to allow the State to go into the June 19 incident for the purpose of showing motive. Specifically, the trial court ruled: "I'm going to let you [the prosecution] go into motive, and I'm going to let them [the defense] go into the motive, too. A counter motive or whatever you want to call it." The motive that the trial judge was referring to with respect to the defense involved criminal charges against Huderson. Apparently, it was a part of the defense theory that Huderson had a motive to lie about what happened in an attempt to gain some leniency on pending criminal charges against him that did not relate to Sanders.
¶ 48. When cross-examination of Huderson was resumed, the defense did not go into the June 19 incident. The defense *758 simply asked Huderson if he had any personal knowledge of Sanders's filing charges against Kelly and if Sanders had ever told him that she had filed charges against Kelly. Under this state of things, I failed to see how the defense in any way opened up the issue of the June 19 incident.
¶ 49. When Cachandia Terrell was called to the witness stand, the prosecution went into detail about the June 19 incident. The record is clear that Sanders never filed any charges against Kelly stemming from the June 19 incident, and it is equally clear, according to Kelly's testimony, that he knew Sanders had not filed any charges against him. The State offered no evidence to indicate that Kelly was under the mistaken notion that Sanders had filed charges against him. That would have indeed been impossible to do since Sanders and Kelly had gone to the police station together following the June 19 incident.
¶ 50. The majority holds that the fact of Kelly having madeat the moment he broke into Sanders's apartment"specific reference to charges having been filed [against him]" provides the necessary basis for admission of the evidence concerning the June 19 incident. The majority concludes that Kelly's statement in that regard weaves the two events into an inseparable crime. I cannot agree. Kelly's statement does not come close to making that nexus, and even if it does, it does not summon with it the lurid details of the June 19 incident. At most, the jury would have been entitled to simply know that charges, without the details, had been filed by Sanders against Kelly in the not-sodistant past. After all, according to the State's theory, it was motive that the State was attempting to prove. The details of the June 19 incident, as well as its occurrence, are totally irrelevant to motive in the absence of a showing that Sanders filed charges against Kelly or that Kelly believed either that she did or that she was cooperating with law enforcement officials in their prosecution of those charges, no matter who filed them. It is difficult to argue that he believed she did when he and she went to the police station together after the incident. He had personal knowledge that she did not file any charges.
¶ 51. The majority acknowledges that Sanders did not file charges but argues that that fact is beside the point, and that the focus should be not on who filed the charges, but on Kelly's perception that prosecution of the charges necessitated Sanders's testifying against him. As support for this argument, the majority quotes Officer Carlisle: "Sanders would have ultimately been required to testify against Kelly regarding those charges regardless of who actually filed the charges." It is a sufficient response to this argument simply say that there is a vast chasm between the State's requiring someone to testify and obtaining one's cooperation in testifying. The special prosecutor required Susan McDougal to testify in the Whitewater investigation. He is still waiting.
¶ 52. The point is, in the absence of some evidence that Sanders was in some way pushing the charges filed by law enforcement or that Kelly perceived her to be doing so, there is simply no basis for placing the significance, as does the majority, on the statement purportedly made by Kelly when he entered Sanders's apartment on the night of the murder. There is simply no evidence of Sanders's involvement with the June 19 incident beyond that day, nor is there any evidence that Kelly believed Sanders was cooperating with law enforcement officials in their prosecution of the June 19 charges. The statement made by Kelly related to *759 charges being pressed as opposed to testimony being given or to be given. While the record reflects that Kelly had gone to court twice for a preliminary hearing on the June 19 charges, it also reflects that the hearing had not been held. There is no indication that Sanders was involved in the attempts to hold the preliminary hearings or that her absence had anything to do with their not being held.
¶ 53. Further, if, as the majority implies, it was the need to eliminate Sanders as a witness that provided the motive for Kelly's actions, then Kelly's comment, upon entering the apartment might have been "Man, I'm going to kill that b____ to keep her from testifying against me" rather than what he said which was, "Man, I'm going to kill that b____ cause she keep pressing charges on me every time I pass in front of her house. She presses charges on me." It is my understanding from the record that no charges were pressed against Kelly by Sanders or anyone else as a result of Kelly's passing in front of Sanders's house. Indeed, the record reflects that the only charges filed against Kelly were those filed by Officer Carlisle stemming from the June 19 incident. That incident did not involve Kelly passing by Sanders's apartment.
¶ 54. The majority also finds support for its view in the fact that the defense told the trial judge that the defense needed to ask Huderson about the charges. Specifically, the majority says, "It was only logical at that point to allow further testimony regarding the incident of June 19 to show that the charges were filed even though Sanders herself did not file them." Majority opinion at ¶ 14. I find this reasoning faulty in two respects. First, Huderson knew nothing about the June 19 incident and did not at that point, or at any other point, testify about the June 19 incident. Secondly, it was Huderson, a prosecution witness, who volunteered the statement about the kidnapping charges, discussed earlier in this opinion. Further, there is nothing about the July 28 incident, for which Kelly was on trial, that could not have been told in a rational and complete fashion without relating the details of the June 19 incident.
¶ 55. Additionally, the majority holds that since Kelly himself testified about the June 19 incident, he should not be heard to complain. It is sufficient to say that Kelly's testimony came after he had attempted unsuccessfully to keep the evidence out and after Terrell had testified in great detail about the incident. In my opinion, this forced Kelly to try and put the best spin he could on the damaging evidence. That required him to testify about it. Certainly, under these circumstances, his testifying about the incident did not operate as a waiver of his objection to the evidence.
¶ 56. While the State argues here, and at trial, that evidence of the June 19 incident was relevant to show motive, it appears that Kelly's real motive for murdering Sanders was Sanders's breaking off the relationship with him and starting one with Huderson, the person Kelly caught in bed with Sanders. By Huderson's own testimony, he and Sanders were sexually involved and had in fact engaged in sexual relations the night Kelly broke in and murdered Sanders. Further, Huderson testified that he had been at Sanders's apartment on one other occasion when Kelly was there. At that time, he left immediately when he discovered Kelly was there.
¶ 57. Finally, it does not appear from the record that either a M.R.E. 403 balancing analysis was done or a limiting instruction given as required by Smith v. State, 656 So.2d 95, 100 (Miss.1995). The majority does not discuss this omission. Apparently, the majority believes that evidence of *760 motive under M.R.E. 404(b) does not have to pass through the M.R.E. 403 filtering analysis. I believe it was error to admit evidence of the June 19 incident. Nevertheless, because of the overwhelming evidence against Kelly, I believe the failure in this regard was harmless error.

II. Evidence of larceny of the commandeered vehicle
¶ 58. Kelly objected to admission of evidence regarding larceny of the automobile he jumped into when fleeing the murder scene and chasing Huderson. Kelly was indicted separately for this offense. He contends that admitting evidence of larceny of the automobile operated to effect a joinder of the two indictments and to place him twice in jeopardy for the same offense.
¶ 59. In discussing why the evidence of grand larceny of the automobile was admissible, the majority says this: "Kelly was indicted separately for grand larceny, the State was first required to demonstrate the relevance of the grand larceny to the charge of murder.... The evidence was admitted because the State bore its burden." Majority opinion at ¶ 17. I fail to see how taking someone's automobile is relevant to proving that one murdered another person unconnected with the stolen automobile. The State did not have a burden to show how Kelly escaped. Apparently, the majority is referring to the fact that blood, matching the murder victim, was found in the stolen automobile. Certainly, that evidence is admissible as well as evidence proving Kelly's connection with the automobile. However, that is the extent of the necessary foray into the evidence regarding the automobile. In my opinion, it was only necessary for the jury to know that Kelly jumped into the automobile and the victim's blood was found therein.
¶ 60. Whether the evidence concerning the stolen automobile, offered by the State in Kelly's murder trial, precludes a trial of Kelly on the grand larceny charge must await that trial. It is sufficient here to say that nothing that was admitted about the stolen automobile poses a jeopardy bar in Kelly's murder trial.
THOMAS, J., JOINS THIS SEPARATE WRITTEN OPINION.